## EATON *v.* NEUMARK *et al.*

*(District Court, S. D. New York.* January 21, 1888.)

1. CARRIERS—RESTRICTION OF LIABILITY—NUMBER OF PIECES AND WEIGHT.

A clause in a bill of lading which states that the vessel is not to be responsible for the number of pieces, or the weight, removes the ship's presumptive liability for the weight stated in the bill of lading, and leaves her liable only for what is proved to have been actually put on board; and where different weights are put in evidence by the consignee. the greater cannot be adopted without some preponderating proof in its support.

2. SHIPPING—CARRIAGE OF GOODS—DELIVERY—FORWARDING.

A vessel arrived with a consignment of iron rails deliverable to two several consignees. The quantity delivered to respondents was short of that called for by their bill of lading. The discharge was made direct from the ship into cars of a railroad company authorized by the consignees to accept delivery, and it appeared that the master of the vessel had indicated respondents' portion of the rails as they were put on the cars, but that, owing to some mistake, in which respondents' agent participated, one car-load had been forwarded to the wrong consignee. *Held,* that it was not the duty of the master to act as forwarder, and as the vessel had properly delivered the rails she was entitled to freight without rebate.

In Admiralty. Libel for freight.

The libelant Eaton, sues to recover freight on a consignment of rails. The respondents, Neumark *et al.*, set up shortage in the quantity delivered as an offset to the demand.

*Wing, Shoudy & Putnam,* for libelant.

*L. Edgar Aron,* for respondents.

BROWN, J. The master at Dantzig signed two bills of lading for iron rails shipped there by the same shipper, all deliverable at Philadelphia, to order,—the one for 1,825 pieces of iron flange rails; the other for 192 pieces of flange rails, and 814 pieces of tram rails. The bills of lading were transferred to different consignees, both of whom provided for the delivery of the iron on their behalf at Philadelphia to the Reading Railway Company at its wharf. The iron was not allowed to be put on the wharf, but was required to be put into the Reading Railroad cars direct from the ship, and was weighed by a United States weigher in the cars, after it had been thus loaded. The master of the vessel and a United States inspector supervised the handling of the iron as it went from the ship to the cars, and counted the pieces. The weighers' returns specified the amount forwarded by cars on account of each consignee, and made the respondents' iron fall short about 28 tons in weight, and 245 in number of pieces; a shortage which is set up as an offset to the libelant's claim for freight.

The testimony, taken on commission at Dantzig, goes to show that the exact number of pieces and the weight given in the bill of lading were put on board the vessel there. The weigher's returns at Philadelphia of the whole consignment of rails under both bills of lading shows an excess of 243 pieces in the number of rails, and about 20 tons less of aggregate weight. The circumstances of the case, the excess of the

number of pieces, as well as the positive testimony that all that was shipped on board was delivered at Philadelphia, satisfy me that no iron was lost or misappropriated by the ship, but that all that was shipped was delivered to the railroad company; while the weigher's certificate and returns leave no doubt that at least 8 tons that should have gone to the respondents' account was forwarded by the railroad company to the account of Walbaum & Co., the holders of the other bill of lading; since those returns show an excess of 8 tons weight assigned to the latter above the weight stated in their bill of lading, and an excess of 488 in the number of pieces. There remains an additional difference of 20 tons weight unaccounted for. For this difference of 20 tons in the aggregate weight the ship is not responsible; because both bills of lading expressly state, in a written clause, that she is "not to be responsible for the number of pieces or the weight." Clauses like this have been often held to remove the ship's presumptive liability for the weight stated in the bill of lading, and to leave her liable for only what is proved to have been actually put on board. *Matthiessen* v. *Gusi*, 29 Fed. Rep. 794; *The Ismaele*, 14 Fed. Rep. 491, 22 Fed. Rep. 559; *The Tangier*, 32 Fed. Rep. 230.

Upon the testimony, as I have already said, I have no doubt that the vessel did deliver to the railroad company all that was shipped at Dantzig. It is impossible to say how the large difference of 20 tons in the two weights arose. Both weights were proved by the respondents. There is nothing to show that the one is correct rather than the other. The burden of proof is upon the respondents. To hold the ship for the larger weight, they must show a preponderance of proof in its favor; which is not shown. If the Philadelphia weight is correct, certainly the ship is not answerable for the Dantzig weight; if it was erroneous, then the consignees, one or both, have actually received more weight than is acknowledged. For, as regards the amount actually received, they adopt the Philadelphia weight. No subsequent test of that weight was made, or, if made, it was not put in evidence. In view of the large apparent shortage, it seems but natural that some further inquiry about the weight, or number of cars, should have been made of the persons to whom the iron was delivered by the railroad company; as well as a demand of the eight-tons excess forwarded by the company on Walbaum & Co.'s account. As the evidence stands, I must assume the Philadelphia weight to be the correct weight of all that was shipped.

The only question that remains is whether the ship discharged her legal duty as to the *manner* of delivering what she had on board. It was the master's duty to see that the cargo, for which he had given separate bills of lading, though received from one shipper, should be delivered in separate lots according to the bills of lading. *Bradley* v. *Dunipace*, 1 Hurl. & C. 521. The separate bills of lading, deliverable to *order*, were notice that the goods might be dealt with separately; and before delivery the master knew that they had been transferred to different holders, and that their rights were quite distinct. The master was therefore bound to deliver to each separate holder, either his own goods. or, if they were all alike in value and mixed up, as he says they were, then the proper

share of each out of the whole in bulk. The difficulty here does not arise from the law, but in its application to the further facts of the case.

The ship was required to deliver at a dock directed by the consignees, and they directed the Reading Railroad dock for delivery into the cars of that company on their account. The company did not permit any discharge upon the wharf, but only into its cars for transportation. That was, therefore, the mode of delivery required by both consignees; and, in the absence of the consignees themselves, or any other person to represent them, the company would be the common agent and representative of both consignees to receive delivery from the ship. The United States inspector, however, is proved to have been specially engaged by the respondents to act in their behalf, and to see that they got their proper amount of rails, and he undertook to do so. No one specially represented Walbaum & Co., the other consignees. The inspector testifies that the master and himself did endeavor to appropriate to each the proper amount. The master testifies that he separated all the tram rails and loaded them in the cars for the respondents, and designated the rails for them as they went into the cars; and in one of these cars, nearly filled with the tram rails, he was also particular to put 192 pieces of flange rails, the number called for by the respondents' bill of lading. The inspector confirms this. The respondents could not tell whether the deficiency in what they received was in the flange rails or in the tram rails; the prices of both being the same, no attention was given to that point, and no complaint is made as to the identity of any particular rails. A tally of the number of pieces was kept by the master and the inspector as the iron was discharged from the ship into the cars. When a car was loaded it was sent down to the weigher, who weighed it and marked the weight of the rails under the car number; and the *inspector* gave the weigher the *address* of the car, either verbally or on a slip of paper, and the cars were supposed to be marked and forwarded accordingly. Corresponding entries were made in the weigher's books, and the the cars were forwarded as addressed. The original books were not produced in evidence; only a transcript, showing the aggregate number of cars, the weight of iron, and the number of pieces forwarded on account of each consignee.

In this work it was manifestly no part of the master's duty to act as forwarder; nor to see to the marking of the cars, either with the proper address, or the proper weight; nor to see that all the cars loaded were properly dispatched. He was required only to discharge the iron from the ship into the cars, and to designate what iron was for each consignee. Considering that there was an apparent shortage or difference of 20 tons in aggregate weight, and that notwithstanding that fact an actual excess of 8 tons was sent to Walbaum & Co., it is clear that a gross mistake was committed by somebody in sending at least one car-load (about 15 tons) to Walbaum & Co. that ought to have been sent to the respondents. But no sufficient proof appears that this mistake was the master's, or by the master's fault. The master did not direct the weigher how to mark the *cars*, and he was not bound to do so; nor was he bound to examine the cars to see that they were rightly marked. That was the duty of the

forwarders. The master had only to designate the respondents' iron as it left the ship, and that, he says, he did. There is nothing to controvert that testimony. The master dealt with the inspector, who was acting in that matter for the respondents and at their request. It was the inspector who gave all the directions to the weigher.

In my judgment the case stands the same as if one of the respondents, while receiving delivery by loading the iron into the cars, had himself designated to the weigher the person for whom each car should be marked. If they did not get what belonged to them, was it not clearly by their agent's own fault? How could he throw the responsibility of a clear mistake made by some one in the address, of say one car-load, upon the master, except on clear proof that the error was the master's, and did not arise from any mistake of his own or of the weigher's? There is no such proof. The very fact that Walbaum & Co. were receiving 488 pieces and 8 tons in excess of the weight specified in their bill of lading, while the respondents were receiving 245 pieces and 28 tons short of what their bill of lading specified, convicts the inspector, who was acting for the respondents, and who knew the weights called for by each bill of lading, either of the grossest inattention to the duties he had assumed, or else of a mere verbal mistake in communicating to the weigher the name of the consignee designed; unless, indeed, the mistake was on the weigher's part in understanding and writing down what had been told him, which is equally possible. The excess of pieces and weight in the cars marked for Walbaum & Co.'s account convinces me that this is not a case of an *intentional* appropriation of that whole weight to Walbaum & Co., but of *accidental* error in the communication of the master's direction, or in the execution of the direction, of one car-load, contrary to the intent. The inspector swears that he was not inattentive, but trying to get the proper weight for the respondents. If this is true, the necessary conclusion is that the mistake as to the direction of one car-load was an accidental misdirection by the *inspector* to the weigher, or that the *weigher* misunderstood and assigned one car to the wrong person. In neither case would the fault be the master's. The fact that the number of pieces sent to the respondents by the railroad company is even 53 pieces short of the number of tram rails, all of which belonged to the respondents, which were, as the master says, easily distinguishable and separated, and were designated by him for the respondents, besides the additional 192 pieces of flange rails put with them, confirm my conviction that this mistake was not the master's. The proof establishes a certain mistake on the part of the weigher or the inspector. It goes no further, except inferentially, as to the author of the error. The fact that one of these two persons made a mistake in directing one car seems to me not to afford any legal inference that the master made a similar mistake. The error cannot be traced back of the inspector. The inspector's act was not the master's act, for he was not the master's agent, but the respondents' agent. Upon the evidence, moreover, if any mistake could be inferred on the part of the master, or could be legally charged to him, in assigning or directing one car-load to Walbaum & Co. that should have gone to the respondents,

there was, at least, concurrent error on the part of the inspector; and, as I have said, the inspector's act was the same as that of the respondents themselves. In effect, the master and the respondents were acting concurrently in directing what iron belonged to the respondents. If there was any mistake by the master, it is certain that the inspector concurred in it, and communicated it. In legal effect, therefore, the respondents acquiesce in what was done through the concurrent acts of the inspector. Upon a mistake made in that way, and by the joint acts of both, if any mistake was indeed made by the master, I think the ship had the right to rely on the respondents' acquiescence at the time, for such is the legal effect; and to require the respondents to correct the error by pursuing the goods themselves which they had concurred in misdirecting, rather than make a claim against the master or ship. In truth, however, there is no proof of mistake by the master personally; the inference from the testimony is to the contrary. As I have said, the proof does not go back of the inspector; and as no failure of duty on the master's part is proved, so far as shown to me, the libelants are entitled to a decree for the freight, with interest and costs, without rebate for the alleged shortage or nondelivery.